UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jerrell James,

      Plaintiff,

v.

      **MEMORANDUM OPINION
AND ORDER**
Civ. No. 16-2462 (MJD/HB)

Soo Line Railroad d/b/a Canadian Pacific,

      Defendant.

_____

      Cortney S. LeNeave and Thomas W. Fuller, Hunegs, LeNeave & Kvas, P.A., Counsel for Plaintiff.

      Jennifer K. Eggers, Timothy J. Carrigan and Allison N. Krueger, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Counsel for Defendant.

_____

      This matter is before the Court on Defendant's motion for partial summary judgment and to exclude Plaintiff's Expert Lighting Opinions.

## I.      Factual Background

      Plaintiff was hired as a conductor by Defendant Soo Line Railroad d/b/a Canadian Pacific ("Soo Line") in November 2014.  Prior to his hire, Plaintiff earned an Associates Degree in Railroad Operations from the Northwest Railroad Institute in Vancouver, Washington.  Plaintiff began the conductor's training

program on November 18, 2014. The training consisted of two weeks in a classroom setting, six weeks in the area the trainee would work, and two final two weeks was devoted to completing the GCOR exam. (Fuller Decl., Ex. 1 (Plaintiff Dep. 18).) During this training, he learned how to tie hand brakes, line the switches, get on and off moving equipment and crossing over from one piece of equipment to another. (Id. 18-22.) He was shown a Powerpoint presentation describing the safe procedure for dismounting a moving locomotive and learned Canadian Pacific safety rules related to detraining from moving equipment. (Id. 138; Eggers Aff. Ex. 2 (CP Safety Rules & Safe Work Procedures Powerpoint); Ex. 3 (Rule T-11).) The training he received at Northwest Railroad Institute was similar, but more in depth, and also included training on how to get on and off moving equipment. (Id. 144.)

After the initial classroom training was completed, Plaintiff was sent to Harvey, North Dakota to begin on-the-job training for six weeks. (Fuller Decl. Ex. 1 (Plaintiff Dep. 18).) During that time, Plaintiff worked on approximately 18 train assignments. (Eggers Aff. Ex. 4 (Plaintiff's Work History).) He passed his exams in January 2015 and went back to Harvey to continue his on-the-job training. (Id. Ex. 5 (Exam Sheet); Fuller Decl. (Plaintiff Dep. 30).) On March 1,

2015, Plaintiff was certified as a new conductor.  (Eggers Aff. Ex. 6).)

### A.    Plaintiff's Injury

On March 12, 2015, Plaintiff was working on the H74 train assignment with fellow crew members Doug Mattern and Darwin Dietz at the Voltaire, North Dakota railyard.  (Fuller Decl. Ex. 1 (Plaintiff Dep. 75); Eggers Aff. Ex. 7 (Mattern Dep. 20); Ex. 8 (Dietz Dep. 6-7).)  On that night, Mattern was the conductor, Dietz was the engineer and Plaintiff was the brakeman.  (Eggers Aff. Ex. 7 (Mattern Dep. 20); Ex. 8 (Dietz Dep. 6-7).)  As the conductor, Mattern was supervising Plaintiff.  (Id. Ex. 7 (Mattern Dep. 20).)

Plaintiff was not familiar with the Voltaire yard, and the crew's supervisor, James Ferderer instructed that Plaintiff be given a map of the yard.  (Fuller Decl. (Plaintiff Dep. 39-40).)  Prior to the night of his injury, Plaintiff also had the opportunity to visit the Voltaire yard and familiarize himself with it by walking around with Mattern.  (Id. 77.)  When the crew got to the Voltaire yard on the night of March 12, 2015, Mattern was showing Plaintiff the proper way of doing certain jobs in the industry.  (Id.)  Plaintiff said he chose to walk along the tracks for the most part that night because he believed the conditions were muddy, and the light poor, and he was concerned about getting on and off moving

equipment.  (Id. 78-79.)

Right before the accident, Mattern instructed Plaintiff to get on the locomotive and ride it a short distance so he could get off the train and line the west end switch.  (Id. 85-86.)  Plaintiff got on the locomotive on the short nose and placed both hands on the handrails and held on at the bend of the stairs while his feet were positioned on the bottom, grated platform.  (Id. 90-91.)  Plaintiff's head was facing the direction in which the locomotive was moving, and his body was turned slightly to the side.  (Id. 91.)  He had a lantern on his wrist.  (Id. 116.)

Plaintiff informed the engineer on the radio that he would be getting off the locomotive in three car lengths.  (Id. 92, 97.)  Plaintiff dismounted the locomotive, starting with his trailing foot, which was his right foot.  (Id. 108.)  He checked the area for debris before he dismounted and noted that the ground was muddy and soft.  (Id. 109.)

At his deposition, Plaintiff testified that his right foot became stuck in the ground, causing him to roll and his left ankle to turn left.  (Id. 112.)  Later in the deposition, Plaintiff testified that it was his left foot that made the hole in the ground, and after his left ankle twisted left, he fell to the ground.  (Id. 175.)

4

Plaintiff did not claim a problem with his boots or the locomotive and he felt he was adequately trained to get off moving equipment.  (Id. 120.)  He believed the accident was caused by conditions on the ground and poor lighting.  (Id. 123.)

The engineer stopped the train as soon as he saw Plaintiff on the ground. (Eggers Aff., Ex. 8 (Dietz Dep. 35).)  An ambulance arrived 40 minutes later and took Plaintiff to Trinity Hospital in Minot, North Dakota where it was determined that Plaintiff suffered a lateral and posterior malleolar fracture of his left ankle and that surgery was required.  (Fuller Decl., Ex. 1 (Plaintiff Dep. 147); Eggers Aff., Ex. 13.)

Plaintiff completed an injury report for Soo Line and listed as contributing factors "no lighting, muddy conditions, lack of fines, and no ballast whatsoever." (Fuller Decl., Ex. 1 (Plaintiff Dep. 124-25); Ex. 2 (Injury Report).)

Plaintiff's medical expert, John G. Stark, M.D., opined that Plaintiff cannot return to work as a conductor because that job requires him to be on his feet for long periods of time as well as walking on uneven ground.  (Eggers Aff., Ex. 13 (Stark Report).)  He further opined that Plaintiff could suffer the same injury detraining a non-moving locomotive.  (Id., Ex. 14 (Stark Dep. 27-28).)

5

**B.      Safety Rules**

Canadian Pacific has a Train and Engine Safety Rule Book.  (<u>Id.</u> Ex. 3.)

Rule T-11 covers detraining moving equipment, and it provides that detraining

moving equipment is permissible when conditions are determined to be safe.

(<u>Id.</u>)  Rule T-11 sets forth the procedures to follow before detraining.  There are

seven steps to be followed, which are:

Step 1:      Communicate your intention to detrain to the locomotive
engineer.  When getting off equipment, always face the
direction of travel.  Visually select a safe area to detrain well in
advance.

Step 2:      Ensure that your detraining area:

•      Will provide solid footing, and
•      Does not have any object or condition that will cause
you to slip or trip.

Step 3:      When getting off equipment, always face the equipment that
you are about to detrain and look where you are going to
place your feet.

Step 4:      As you get closer:

•      Narrow your focus on a detraining spot, checking that it
is free of tripping hazards.
•      Drop your trailing foot (relative to the direction of
movement) from the stirrup.
•      Lower your trailing foot to the ground, lining your toes
in the direction of movement and step away with the

6

leading foot releasing your lead hand.

Step 5:    Maintain a grip on the handhold with your trailing hand (relative to the direction of movement) until you are balanced on your feet.

Step 6:    Once your balance is ensured, release your trailing hand from the handhold and step away from the track.

Step 7:    Communicate to the locomotive engineer once you are safely off the equipment.

(Id.)

## C.    Plaintiff's Allegations

Plaintiff alleges that Soo Line is liable for ordinary negligence under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. §§ 51-60, in failing to provide a reasonably safe workplace and strictly liable for violation of safety statutes and/or statutes enacted for the safety of railroad employees.

Before the Court is Soo Line's motion for partial summary judgment.  Soo Line seeks dismissal of Plaintiff's strict liability claims and his negligence claim to the extent it is based on allegations that Soo Line caused the accident with inadequate workplace illumination or by allowing employees to dismount from moving train equipment or any other training claims as such claims are precluded by federal law.

II.      **Motion to Exclude Expert Opinion**

A.      **Standard**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The role of trial courts is to serve as "gatekeepers to 'insure that the proffered expert testimony is both relevant and reliable.'" <u>Wagner v. Hesston Corp.</u>, 450 F.3d 756, 758 (8th Cir. 2006) (quoting <u>Anderson v. Raymond Corp.</u>, 340 F.3d 520, 523 (8th Cir. 2003)).  In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, the Supreme Court provided some general observations for the lower courts to consider in making determinations as to whether the scientific knowledge is relevant and reliable, such as whether it has been tested, subjected to peer review and publication, what is the known or potential rate of error, and whether it is generally accepted.  509 U.S. 579, 593-95 (1993).

In <u>Kumho Tire Company, Ltd. v. Carmichael</u>, the Court extended the <u>Daubert</u> reasoning to non-scientist experts stating:

> We conclude that <u>Daubert's</u> general principles apply to the expert matters described in Rule 702.  The Rule, in respect to all such matters, 'establishes a standard of evidentiary reliability.'  It 'requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility.'  And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the [the relevant] discipline.'

526 U.S. 137, 149 (1999) (quoting <u>Daubert</u>, 509 U.S. at 590-92) (citation omitted).

When addressing the reliability factor, the Court held that "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).  Moreover,

> [T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.  Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

<u>Bonner v. ISP Tech, Inc</u>., 259 F. 3d 924, 929-30 (8th Cir. 2001) (citing <u>Hose v. Chicago NW. Transp. Co.</u>, 70 F. 3d 968, 974 (8th Cir. 1996)).

### B.    Artificial Lighting

At the location where Plaintiff was injured, artificial lighting is provided by a number of light poles.  (Carrigan Aff., Ex. B (Mattern Dep. 74); Ex. C (Dietz Dep. 36); Survey of Area (Soo Line Brief at 4).)  Dietz stated that on the night of the incident, all of the light poles were working.  (Id. Ex. G (Dietz Interview).)

### C.    Testimony of Jason Samuels

After the incident, Trainmaster Jason Samuelson took a number of photographs.  (Carrigan Aff. Ex. D (Samuels Dep. 9-11); Ex. H.)  Samuels testified that he did not specifically photograph the lights in the area and he admitted the quality of his photographs were not all that great.  (Carrigan Aff., Ex. D (Samuels Dep. 56).)  He also testified that he did not take exception to the lighting there.[1]

### D.    George Gavalla

In support of his claims, Plaintiff has submitted an expert report from George Gavalla.  George Gavalla is a railroad safety consultant, with 37 years experience, who evaluates practical and technical issues related to rail yard

---

[1]The original deposition transcript provided that Samuels testified that he did take exception to the lighting.  After reviewing the transcript, Samuels submitted an errata sheet and clarified that there was a typographical error and that his testimony was that he did not take exception to the lighting.  (Id. Ex. P.)

switching operations, safety training and FRA regulations.  Prior to becoming a

consultant, Gavalla was an Associate Administrator for Safety at the Federal

Railroad Administration.  He also has worked in the Brotherhood of Railroad

Signalmen and began his career as a Communications/Signal Maintainer for

Consolidated Rail Corporation.

Based on his training, education, and experience in the field, Gavalla

reported on the hazards caused by Soo Line's unsafe procedure for getting on

and off moving equipment.  For example, he asserts the dangers of getting on

and off moving equipment has long been recognized as inherently risky in the

railroad industry and that most major railroads prohibited the practice in the

early 1990s.  He noted that dismounting a moving train creates the potential to

slip or trip because the ground is moving and the steps are usually 20 to 25 inches

above the ground.  (Eggers Aff., Ex 16 (Gavalla Rpt. at 14-15).)  Gavalla also

addressed safety issues created by muddy and hazardous ground conditions,

and those created by poor lighting and lack of training.  (Id. at 11-13.)

Gavalla further opined that Soo Line violated 49 CFR § 242.119 because

Plaintiff was not fully qualified as a conductor at the time of his accident, and a

violation of a railroad's conductor training program is considered a violation of

the regulation itself.  (Eggers Aff., Ex. 16 (Gavalla Rpt 22-23).)  Gavalla further

opined that Soo Line did not comply with their own program because they did

not fill out evaluations on a daily basis prior to certifying him as conductor.  (Id.,

Ex. 12 (Gavalla Dep. 75).)

For purposes of this motion, Gavalla also provided an opinion as to the

lighting conditions on the night of the accident.  Based on Plaintiff's testimony

that the yard was dark and lacked sufficient lighting to be able to ascertain the

ground conditions, the statement of the CP Trainmaster Jason Samuels who

"took exception to the lighting" and photographs taken by Samuels, Gavalla

opined that the yard was very dark that night and there was insufficient light to

ascertain the hazardous ground conditions.  (Carrigan Aff., Ex. L. (Gavalla Rpt.

14, 17).)  As a result, he opined that it is highly likely the poor lighting conditions

contributed to Plaintiff's injury.  (Id.)

In his deposition, Gavalla admitted that he does not know what kind of

camera was used by Jason Samuels to take the photographs of the night of the

injury, and that he did not see any photographs which included the light poles in

the yard.  (Id., Ex. O (Gavalla Dep. 39-40).)   He also testified that he would

change his opinion if he saw there were light poles in the vicinity and there was

12

additional lighting in the yard.

### E.    Raymond Duffany

Raymond Duffany is a railroad engineering consultant who has been in the railroad industry since 1975.  He began his career at Consolidated Rail Corp. as an Assistant Supervisor of Track and by 1986, he was a Chief Regional Engineer. Later, he worked at Grand Trunk Western Railroad Company for approximately eight years, and has been a consultant since 1998.

Duffany provided professional engineering opinions regarding the relevant conditions at the Voltaire railyard on March 12, 2015.  Based on his review of a number of relevant materials, Duffany opined that the area where Plaintiff dismounted did not have a full ballast section and there was no level area for him to step onto and the ballast was sloped.  (Carrigan Aff., Ex. J (Duffany Rpt. at 8).)  Duffany also wrote in his report that as part of yard worker safety, railroads need to provide adequate lighting for night work and that a train's headlamp or a handheld lantern or flashlight are insufficient.  He further concluded, based on Plaintiff's statements and Samuels' photographs, that the lighting at the Voltaire railyard was poor and that the lack of sufficient fixed artificial lighting and Plaintiff's relative inexperience were contributing factors in

this incident.  (Fuller Decl., Ex. 5 (Duffany Rpt. 10).)

**F.    Discussion**

Soo Line moves to exclude evidence of Gavalla's and Duffany's opinions that poor lighting at the Voltaire yard contributed to Plaintiff's accident.  Soo Line argues that this testimony must be excluded, to the extent such testimony is based on the photographs taken by Samuels, as neither is an expert in the fields of human factors, photography, visual science or perception.  An expert in these fields attempting to scientifically characterize the lighting at the time and place of the accident would not blithely conclude the "dark" level of illumination observed in a cell phone photograph is a close representation of the actual illumination observed by someone physically present at the time the photo was taken.  Cameras have many variables of operation, such as shutter speed, aperture, flash and other device settings that affect the brightness of a photograph.  Duffany and Gavalla have not attempted to analyze the settings of trainmaster Samuels's camera to extrapolate from his photographs the amount of illumination at the time and place of the accident.

Soo Line further argues to the extent that Duffany and Gavalla based their opinions as to lighting on the testimony of Plaintiff, such testimony must be

excluded because it is not helpful to the jury and lacks foundational reliability. Duffany and Gavalla will not assist the jury by simply parroting Plaintiff's testimony under the guise of an expert opinion.

As to foundation, Soo Line notes that neither Gavalla or Duffany visited the scene of the accident to observe the illumination provided by the fixed lighting at the scene. Gavalla admitted at his deposition that he was not even aware that there were sources of artificial light from light poles at the scene. Further, neither Gavalla nor Duffany cite to a specific standard that the illumination in the yard failed to satisfy. Instead, they opine that the lighting was poor without specifying a measuring stick against which to compare the amount of illumination in the yard. Finally, both experts fail to take measurements of illumination levels at the scene or examine the lantern that Plaintiff was carrying that night. As a result, the experts are offering testimony on their say so alone. Generally, the *ipse dixit* of the expert is considered an unreliable basis for expert testimony and is not admissible. <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).

The Court agrees that Gavalla's and Duffany's opinion that poor lighting at the site of the incident contributed to Plaintiff's injury is not reliable and should be excluded. Both experts admitted that they were unaware of the light poles on

the scene.  (Carrigan Aff. Ex. K (Duffany Dep. 79 ("Q: And you never got to see the lighting in this yard, correct? A: That's correct."); Ex. O (Gavalla Dep. 39-40 ("Q: So you don't know whether there are any lights in that yard?  A: At the area where he fell I didn't see any – I don't recall any – yeah, there is no photographs of any light poles nearby.").  Furthermore, these experts did not provide any measurements as to lighting or testimony as to industry standards for lighting therefore they have no independent foundation for an expert opinion as to lighting.  See Nichols v. Cont'l Airlines, CIV.  01-232-B-S, 2002 WL 1724017, at *3 (D. Me. Jul. 23, 2002) (finding expert testimony as to lighting in the plane did not assist jury and lay witnesses could describe the degree of darkness and the jury could decide the issue based on common experience); see also Am. Auto. Inc. Co. v. Omega Flex, Inc., 783 F.3d 720, 725 (8th Cir. 2015) (excluding expert testimony that was not based on specific design expertise, based on the court's concern that a jury may afford such testimony more weight than warranted because of expert's expertise in other areas).  Accordingly, the Court will exclude any opinion or testimony from both Gavalla and Duffany that poor lighting conditions contributed to Plaintiff's injury.

## III.    Standard for Summary Judgment

### A.    General Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).  The party opposing summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B.    FELA Claims

The FELA makes a common carrier engaged in interstate commerce "liable in damages to any persons suffering injury while he is employed by such carrier in such commerce * * * resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier * * *."  Under the FELA, "the railroad will be liable if its or its agent's negligence

played any part, even the slightest, in producing the employee's injury."
"Under the (FELA), the right of the jury to pass upon the question of fault
and causality must be most liberally viewed. * * * (T)he jury's power to
engage in inferences must be recognized as being significantly broader
than in common law negligence actions."

Ybarra v. Burlington N., Inc., 689 F.2d 147, 149 (8th Cir. 1982) (internal citations

omitted).

### C.    Discussion

#### 1.    Strict Liability - Violation of 49 CFR § 242.119

In support of his failure to train claim, Plaintiff's expert George Gavalla

opines that Plaintiff was not properly trained as a conductor/brakeman, and was

thus not fully qualified to be a conductor/brakeman on the night of his accident.

(Eggers Aff., Ex. 16 (Gavalla Rpt. 22).)  In support of this opinion, Gavalla cites to

49 CFR § 242.119 (a), (d) and (e) which relate to conductor training.  (Id. 23.)

Soo Line argues that Plaintiff cannot base his strict liability claim on an

alleged violation of 49 CFR § 242.119 because on the night Plaintiff broke his

ankle, it is undisputed that Plaintiff was not working as a conductor; he was

working as a brakeman.  As a result, the requirements of this regulation are

unrelated to the work he was performing when he was injured.

The applicable regulations provide that "[t]he conductor certification

18

requirements prescribed in this part apply to any person who meets the definition of conductor contained in § 242.7, regardless of the fact that the person may have a job classification title other than that of conductor."  49 CFR § 242.1. The regulations further define conductor as "the crew member in charge of a 'train or yard crew' as defined in part 218 of this chapter." 49 C.F.R. § 242.7.

As applied here, the Court finds that Soo Line cannot violate the conductor certification requirements with respect to an employee who does not meet the FRA's definition of conductor.  Here, there is no dispute as to the roles played by Mattern, Dietz and Plaintiff on the night Plaintiff was injured, and that Plaintiff was working as a brakeman, not the conductor.  Accordingly, Soo Line cannot be strictly liable for violating the conductor certification requirements in this case because Plaintiff was working as a brakeman when he was injured.

## 2.    Preclusion of FELA Negligence Claims

Under FELA, Plaintiff must prove the same elements as required in a common law negligence claim, including breach of duty, proximate causation and foreseeability.  Norfolk Southern v. Sorrell, 549 U.S. 158, 174 (2007). Although Plaintiff's burden to prove proximate cause under the FELA is lighter than for a common law negligence claim, the burden is the same on the other

essential elements.  Id. at 171.

Soo Line asserts that Plaintiff's FELA negligence claims are premised in part on claims of failure to train, and that any rules and regulations concerning railroad safety are governed by the Federal Railroad Safety Act ("FRSA").  The FRSA was enacted to promote safety in every area of railroad operations and to reduce railroad-related accidents and incidents.  49 U.S.C. § 20101.  To achieve this goal, the FRSA provides that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable."  49 U.S.C. § 20106(a)(1).  To achieve the goal of national uniformity, the FRSA provides that "[a] state may adopt or continue in force a law, regulation, order related to railroad safety" only "until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement."  49 U.S.C. § 20106(a)(2).  Any state law, regulation or order is preempted if a federal regulation or order substantially subsumes the subject matter of the relevant state law.  CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993).

The FRSA has two savings clauses.  The first provides that even if a state

law would otherwise be preempted, "[a] State may adopt or continue in force an additional or more stringent law . . . related to railroad safety" if 1) the state law is necessary to eliminate or reduce an essentially local safety or security hazard; 2) the state law is compatible with federal law; and 3) the state law does not unreasonably burden interstate commerce.  49 U.S.C. § 20106(a)(2).

The second savings clause provides that a state law claim is not preempted if it is based on a railroad's failure to comply with 1) a federal regulation; 2) a plan created by the railroad itself pursuant to federal law; or 3) a state law that is enforceable under the first savings clause.  49 U.S.C. § 20106(b).

Soo Line acknowledges that by its terms, the FRSA preempts only state-law causes of action, and in this case, Plaintiff has asserted a federal cause of action under FELA.  Some federal courts have found, however, that the uniformity demanded by the FRSA can only be achieved if federal rail safety regulations are applied to a FELA plaintiff's negligence claim as they would be applied to a non-railroad plaintiff's negligence claim.  Nickels v. Grand Trunk W.R.R., Inc., 560 F.3d 426, 430 (6th Cir. 2009) (quoting Lane v. R.A. Sims, Jr., Inc., 241 F.3d 439, 443 (5th Cir. 2001); see also Waymire v. Norfolk & W. Ry. Co., 218 F.3d 773, 776 (7th Cir. 2000).  Applying the reasoning of these cases here, Soo Line

argues that Plaintiff's FELA claims based on a theory of failure to train are

precluded by the FRSA if the same claims, brought as state law negligence

claims, would be preempted.

The Eighth Circuit has not yet ruled on this issue, but it has acknowledged

the <u>Nickles</u>, <u>Lane</u> and <u>Waymire</u> line of cases without expressly adopting or

rejecting the holding that the FRSA precludes certain FELA claims.  <u>See</u> <u>Cowden</u>

<u>v. BNSF Railway Co.</u>, 690 F.3d 884 (8th Cir. 2012).  In <u>Cowden</u>, the district court

granted the railroad's motion for summary judgment, finding no genuine issue of

material fact that the railroad breached a duty of care owed to the plaintiff, and

finding that FRSA regulations supplied BNSF's duty of care with respect to speed

and that plaintiff had failed to show that BNSF violated such regulations.  <u>Id.</u> at

888-889.  On appeal, the Eighth Circuit acknowledged the decisions in <u>Nickles</u>,

<u>Lane</u> and <u>Waymire</u> that found the FRSA could preclude claims brought under

the FELA, but noted that the Supreme Court has thus far declined to review these

decisions.  <u>Id.</u>  The court further noted:

> [w]e are mindful that the Supreme Court has cautioned that the FELA
> should not be cut down "by inference or implication."  We are also
> mindful that the Supreme Court has acknowledged "the presumption
> against preemption" in the "relatively stringent standard" of § 20106(a)
> (formerly 45 U.S.C. § 434), and that FRSA regulations have "no affirmative

indication of their effect on negligence law."

Id. at 892.

Based on such considerations, the court

decline[d] to create a circuit split on this issue, in part because the issue
was not properly raised below and the current record does not accurately
demonstrate how preclusion might apply in [plaintiff's] case. Even if we
assume that the express preemption clause in 49 U.S.C. § 20106(a)(2) can be
applied in some cases to preclude federal laws, we do not believe that it
was properly applied in the current case.

Id.

It is Plaintiff's position that his FELA negligence claims are not precluded

by the FRSA, and that this issue is governed by the Supreme Court's decision in

POM Wonderful v. Coca-Cola Co., 134 S. Ct. 2228 (2014).

In POM Wonderful, the Supreme Court addressed the issue of whether a

private party may bring a Lanham Act claim challenging a food label that is

regulated by the FDCA. 134 S. Ct. at 2236. The Court noted the case before it was

not a preemption case, as no state law claim was at issue. Id. Rather, the issue

was one of statutory interpretation, and based on the structure and text of the

statutes at issue, the Court found that the FDCA did not preclude an action under

the Lanham Act. In so finding, the Court recognized that "pre-emption of some

state requirements does not suggest an intent to preclude federal claims." Id. at

2238.  Further, the Court found the Lanham Act and the FDCA actually

complemented each other "for each has its own scope and purpose" and when

two statutes complement each other, "it would show disregard for the

congressional design to hold that Congress nonetheless intended one federal

statute to preclude the operation of the other." Id.  "Although both statutes touch

on food and beverage labeling, the Lanham Act protects commercial interests

against unfair competition, while the FDCA protects public health and safety."

Id.

       Following the decision in POM Wonderful, the district court in Henderson

v. Nat'l Railroad Passenger Corp. declined to follow the Nickles, Lane and

Waymire line of cases and found that the plaintiff's claims under the FELA were

not precluded by the FRSA.  87 F. Supp.3d 610, 616 (S.D.N.Y. 2015).  "If Congress

had intended that the FRSA both preclude covered FELA claims and preempt

covered state law claims, it would have said so." Id. at 617.  In addition, the court

held that the Supreme Court's decision in POM Wonderful "was highly

instructive in interpreting the relationship between the FELA and the FRSA.

       Like the FDCA, the FRSA authorizes an agency to promulgate specific

24

regulations in furtherance of the statute's purpose and provides that those
regulations preempt certain state laws in the interest of national
uniformity.  Like the Lanham Act, the FELA provides a broad private right
of action under federal law that purportedly undermines such uniformity.
And like the relationship between the Lanham Act and the FDCA, the
FELA and the FRSA complement each other in significant respects, in that
each statute is designed to accomplish the same goal of enhancing railroad
safety through difference means.  Under these circumstances, <u>POM
Wonderful</u> clearly dictates that the FRSA should not be interpreted to
preclude federal claims under the FELA, in accordance with the plain
meaning of its text.

<u>Id.</u> at 620-21.

Similarly, in <u>Madden v. Anton Antonov & AV Transp., Inc.,</u> the district

court rejected the railroad's argument that plaintiff's FELA claims are precluded

by the FRSA.  156 F. Supp.3d 1011, 1020 (D. Neb. 2015).  "This Court is not

persuaded by the reasoning of <u>Waymire</u> or its progeny, and respectfully declines

to follow suit.  Neither the plain text of FRSA nor its goal of national uniformity

demand preclusion of FELA claims.  Rather, the text of FRSA and the purposes

underlying both it and FELA demand the opposite." <u>Id.</u>; <u>see also</u> <u>Oliveros v.

BNSF Railway Co.,</u> 8:14CV135, 2016 WL 7475663 (D. Neb. Mar. 3, 2016)(denying

defendant's motion for summary judgment to allow the Eighth Circuit to directly

address the interplay between FRSA and federal negligence claims brought

under FELA); <u>Fair v. BNSF Railway Co.,</u> 238 Ca. App. 4th 269, 282 (2015) (state

court rejected argument that the FRSA precludes FELA negligence claims, recognizing "[i]t is true that, if FRSA preempts covered state laws only, inconsistent recoveries may result for railroad employees under FELA and other plaintiffs bringing state law claims. That risk, however, is not unique, as the relaxed causation standard under FELA already presents a possibility that in any given case, railroad employees may be able to recover under FELA while a plaintiff's state-law claim based on the same negligent conduct fails.").

While Soo Line puts forth a number of arguments as to why this Court should not apply the rationale of POM Wonderful to this case, the Court finds those arguments unpersuasive. Instead, like those decisions in Henderson, Madden, and Oliveros, this Court finds that the plain text of the FRSA does not support Soo Line's preclusion argument, and because FELA and the FRSA actually complement each other and simply provide different means to achieve the same goals of concerning railroad safety, the POM Wonderful decision would dictate a finding of no preclusion. Furthermore, as recognized by the court in Fair, the risk of inconsistent recoveries for railroad employees under FELA and other plaintiffs bringing state law claims already exists, given FELA's relaxed causation standard. Fair, 238 Ca. App. 4th at 282. Accordingly, this Court holds

that Plaintiff's FELA negligence claims are not precluded by the FRSA.

### 3.    Negligence Claim - Inadequate Lighting

Soo Line argues that Plaintiff has failed to produce evidence that due to its alleged negligence in not providing adequate lighting at the Voltaire railyard, Plaintiff was injured. Soo Line argues that while Plaintiff alleges that it was dark in the Voltaire yard when he was injured, he also admits that it was light enough for him to see whether or not there were any debris on the ground before he dismounted from the train. Plaintiff also relies on photographs taken by trainmaster Jason Samuels with his cell phone in the early morning of March 12, 2015 to show that it was too dark to see the poor conditions of the ballast.[2]

In Hurley v. Patapsco & Back Rivers R. Co., 888 F.2d 327 (4th Cir. 1989), the court granted defendant's motion for a directed verdict because the evidence presented at trial - plaintiff's testimony and photographs taken where the incident occurred - would not allow the jury to detect the amount of light present in the shop or generally available at the scene of the injury. In this case, Soo Line

---

[2]Plaintiff also supported his claim that the Voltaire railyard was too dark on the expert opinions of Gavalla and Duffany. As set forth above, the Court will exclude the experts' opinions as to whether the railyard was too dark.

argues that Plaintiff's own testimony is not enough to support his claim that unsafe lighting conditions caused his injury. Plaintiff's testimony that it was "dark" does little or nothing to give jurors a standard by which to determine if the work environment was too dark to be a reasonably safe work environment. In addition, Plaintiff has not provided any lighting measurements against the industrial lighting standard of AREMA, therefore he has failed to produce sufficient evidence to withstand summary judgment.

The Court finds that Plaintiff has supported his claim that lighting played a part in Plaintiff's injury by the following: a personal injury report filled out after Plaintiff was injured which states the injury was caused by poor lighting; a statement given to Soo Line's claims personnel which states the injury was caused by poor lighting; deposition testimony; photographs; the fact that the injury occurred at 2:30 a.m.; and the argument that placement of the light poles was such that they were too far away to provide sufficient illumination. Such evidence is sufficient to withstand Soo Line's motion for summary judgment on this claim.

### 4.      Negligence Claim - Policy Allowing Employees to Get Off Moving Equipment

When negligence claims under FELA involve technical issues that are specific to the railroad industry, and not within common knowledge and ordinary experience of an average juror, a plaintiff cannot rely only on lay-witness testimony and must instead offer expert testimony to meet their burden of proof. Beanland v. Chicago Rock Island & Pac. R.R. Co., 480 F.2d 109, 116 (8th Cir. 1973) (finding railroad should have been given opportunity to present expert testimony concerning the meaning of railroad technical term).

Soo Line asserts that Plaintiff has not put forth any evidence that such a policy/procedure or rule is inherently unsafe, nor has Plaintiff submitted an expert in support of this claim.

While there is no dispute that Plaintiff was injured when he dismounted a moving train, Soo Line argues he has failed to produce an expert to explain how the action of dismounting a moving locomotive caused his ankle to break. Dr. Stark, Plaintiff's independent medical expert, testified that the same injury could occur while dismounting from standing equipment. (Eggers Aff., Ex. 14 (Stark Dep. 27).) He also testified the same injury could occur while going up and down a ladder on the side of a building. (Id.) Because Plaintiff lacks expert testimony to establish that his injury was in fact caused by dismounting a

moving locomotive, he has cannot meet his burden of proof on this claim.

The Court finds that Plaintiff has provided sufficient evidence to withstand summary judgment on this claim. His expert, George Gavalla, discussed the increased risk of harm associated with railroad employees getting on and off moving equipment. He also pointed out that a great majority of North American railroad carriers do not allow the practice unless there is an emergency or some other limited exception. See Eggert v. Norfolk & Western Ry. Co., 538 F.2d 509, 512 (2d Cir. 1976) (finding that evidence of practices of other railroads is highly relevant since the existence of alternatives would be significant on the issue of whether defendants acted reasonably). As such, Gavalla opines that Soo Line's rules allowing the practice do not reflect industry standards and safe operating practice.

Furthermore, while Dr. Stark admitted that Plaintiff could have broken his ankle in different settings, he nonetheless opined that Plaintiff's injury was a result of getting off a moving train.

**IT IS HEREBY ORDERED** that:

1.    Defendant's Motion for Partial Summary Judgment [Doc. No. 24] is

       GRANTED in part and DENIED in part as follows: the motion is

granted with respect to Plaintiff's claims based on strict liability and

denied in all other respects; and

2.    Defendant's Motion to Exclude Expert Testimony [Doc. No. 19] is

GRANTED.  Plaintiff's expert testimony as to poor lighting

conditions is excluded.

Date:   January 3, 2018

s/ Michael J. Davis
Michael J. Davis
United States District Court

31